**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NICOLE BRADLEY,
                    *Petitioner-Appellant,*

v.

GLORIA HENRY, Warden,
                    *Respondent-Appellee.*

No. 04-15919

D.C. No.
CV-03-03034-PJH

OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Submitted June 19, 2007*
San Francisco, California

Filed December 19, 2007

Before: Mary M. Schroeder, Harry Pregerson,
Warren J. Ferguson, John T. Noonan, Sidney R. Thomas,
Barry G. Silverman, William A. Fletcher, Marsha S. Berzon,
Richard C. Tallman, Johnnie B. Rawlinson, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Noonan;
Concurrence by Judge Clifton;
Dissent by Judge Silverman

---

*The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

16503

## COUNSEL

Dennis P. Riordan, San Francisco, California, for the petitioner-appellant.

Gregory A. Ott, Deputy Attorney General, San Francisco, California, for the respondent-appellee.

## OPINION

NOONAN, Circuit Judge:

The appeal in this habeas corpus case is not directed to the guilt or innocence of the petitioner. The question we must address is whether a decision of a California Court of Appeal

was not merely erroneous but objectively unreasonable in its application of the Constitution of the United States as the meaning of the Constitution was determined, at the time of the decision of the California court, by the Supreme Court of the United States. We summarize the underlying criminal case and proceed to consideration of three instances in which the petitioner claims that such unreasonable applications of the Sixth Amendment took place.

*The underlying case.* On January 17, 1996, Bradley, 18 years-old at the time, was involved in an apparent carjacking in the course of which the driver of the car was killed. On January 22, 1996, she was taken into custody.

The case went to trial before a jury in March 1999. The prosecution's case was that Bradley had killed in the course of a felony. Her two juvenile accomplices testified against her, as did a police officer, to whom petitioner had made admissions. No one testified that she had deliberately shot the driver. The shooting appeared to be unintentional. But it was the cause of death during the commission of the carjacking, a felony the witnesses blamed on Bradley. She did not testify in her own defense. She was found guilty of murder in the first degree (*Cal. Pen. Code § 187(a)*), attempted carjacking (*Cal. Pen. Code §§ 664, 215(a)*), and possession of a short-barreled shotgun (*Cal. Pen. Code § 12020(a)(1)*). She received a sentence of thirty-five years to life in prison.

On April 20, 2002, petitioner's conviction was affirmed by a court of appeal. On July 10, 2002, the Supreme Court of California summarily denied review. On June 30, 2003, petitioner filed the present petition for habeas corpus. The petition was denied by the district court, leading to the present appeal.

*The withdrawal of petitioner's counsel and replacement by appointed counsel.* On March 4, 1998, the judge then in charge of the case had a conference in his chambers. Present were the district attorney of Sonoma County, the deputy dis-

trict attorney who was prosecuting the case, and an investigator from the district attorney's office. Also present was Cynthia M. Dunlevy, retained for the defense, and two lawyers who had no apparent connection with the case. By order of the judge, the record of what happened was sealed until the conclusion of the trial. The petitioner was not present.

This conference was about two concerns: Dunlevy's desire to withdraw as counsel because of serious conflicts with her client, including inadequate payment for defense services; and the prosecutor's fear of foul play on the part of the defendant's father. The presence of the two lawyers new to the case, Andrian and his partner, Gallenson, was explained by the fact that the judge, apparently already alerted to Dunlevy's desire to withdraw, had approached them about being appointed to represent the petitioner. The reason for combining the substitution of counsel with airing of the danger felt by the prosecutor was not explained except by the prosecutor's sense that the petitioner's father, who was paying for the defense, would go to lengths to delay trial. The conference concluded with the judge agreeing to let Dunlevy and her partner withdraw and to put Andrian in their place, not as retained counsel but as appointed counsel to be compensated by the county.

The conferees moved from the judge's chambers to court. Present, in addition to the judge, were Dunlevy, Andrian, the prosecutor, the petitioner, and a lawyer she had chosen to represent her. The judge accepted Dunlevy's motion to withdraw. The judge appointed Andrian in her stead. Dunlevy told the court that the petitioner would like Patrick Hutchinson, the lawyer that she had brought with her to court, to speak on her behalf. The prosecutor objected. The court upheld the objection.

*The sequel.* On October 19, 1998, the petitioner moved to replace Andrian. He stated that there was a conflict between him and his client; that she had filed a complaint against him

with the State Bar; that she had threatened to sue him personally; and that his insurance carrier required him to stop communicating with her. A judge, new to the case, suggested that the insurance problem could be resolved. He ruled that Andrian was not rendering inadequate or ineffective assistance. He continued the case, and six weeks later Andrian's need for insurance was resolved by the county agreeing to indemnify him.

*The petitioner's proposal of new retained counsel.* On January 7, 1999, the petitioner moved to substitute retained counsel, Jonathan Jordan, for appointed counsel Andrian. On January 19, 1999, the trial judge held a hearing on this motion. The judge expressed concern about delays by what he said almost amounted to "lawyer-churning." He also expressed concern about the payment of Jordan. Jordan assured him that he would be ready by the date appointed for trial and was satisfied as to the arrangements for his compensation. The judge denied the petitioner's motion to substitute Jordan for Andrian. The judge also rejected Jordan's suggestion that he become associate counsel with Andrian.

## ANALYSIS

**[1]** The Sixth Amendment to the Constitution of the United States provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This bedrock principle of constitutional law has recently been restated by the United States Supreme Court in these words:

> We have previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him. See *Wheat v. United States*, 486 U.S. 153, 159 (1988). Cf. *Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be

afforded a fair opportunity to secure counsel of his own choice").

*United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2561 (2006).

It is conceded by petitioner that the right is not absolute. What is disputed is whether the California Court of Appeal's application of the governing principle is objectively unreasonable. As the principle is of general application, it is "a rule designed for the specific purpose of evaluating a myriad of factual contexts." *Wright v. West*, 505 U.S. 277, 309 (1992) (Kennedy, J., concurring). "[S]o of course there will be variations from case to case." *Id*. The new application is not "a new rule, one not dictated by precedent." *Id*.

Three arguments are advanced why the application of principle here was not objectively unreasonable: (1) that the trial had been inordinately delayed by petitioner's changes of counsel; (2) that petitioner was not in a position to afford retained counsel; and (3) that any error in denying her counsel of her choice was harmless. We consider these contentions in turn.

1. *Inordinate delay*. Inspection of the docket shows that the following judges of the Superior Court held hearings or made rulings in the case:

| | |
|---|---|
| January 22 - July 18, 1996 | The Honorable F. Passalacqua |
| August 15, 1996 | The Honorable R. Jamar |
| August 30 - October 18, 1996 | The Honorable R. Giordano |
| November 1, 1996 | The Honorable L. Antolini |
| December 13, 1996 | The Honorable E. Watters |
| January 17, 1997 | The Honorable R. Giordano |
| February 28, 1997 - April 13, 1998 | The Honorable M. Tansil |
| July 10, 1998 - March 4, 1999 | The Honorable K. Owen |

As far as the record before us shows, these were the principal delays and their causes:

On March 15, 1996, within two months of petitioner's arrest and before any indictment, the prosecutor pointed to a conflict of interest on the part of petitioner's counsel. Judge Passalacqua ordered his disqualification. No apparent delay resulted.

On October 18, 1996, two months after Bradley's indictment on multiple charges including murder in the first degree with special circumstances, she moved to substitute counsel. Judge Passalacqua granted her motion. At the time no trial date appears to have been set. On December 13, 1996, the date was set for April 14, 1997.

On February 28, 1997, Judge Tansil took over the case and changed the trial date to July 18, 1997 "for calendar control."

On July 3, 1997, for no reason apparent to us, Judge Tansil put off the trial date seven months to March 2, 1998.

On November 21, 1997, Judge Tansil granted Bradley's motion to replace her counsel; announced "this will be the last change in counsel;" and postponed the trial date one month to March 30, 1998.

On March 4, 1998, Judge Tansil permitted Bradley's counsel to withdraw and appointed Andrian. On April 13, 1998, Judge Tansil moved the trial date to October 26, 1998.

On October 19, 1998, Bradley moved to disqualify Andrian. She also indicated her intention to sue him. Andrian explained that his malpractice insurance carrier required him to stop communicating with Bradley upon receiving notice of her intent to sue. Judge Owen postponed the trial date so that Andrian could work out his problem, resolved only by his agreement with the county to indemnify him on December 16, 1998. The trial was eventually reset for February 22, 1999.

For reasons not apparent in the record before us, the trial did not take place until March 1999.

## SUMMARY

| Date | Cause of Delay | Time Lost |
|------|----------------|-----------|
| 3/15/96 | Disqualification by the court of counsel for conflict of interest | None apparent |
| 10/18/96 | Change of counsel on Bradley's motion | None apparent |
| 2/28/97 | Calendar control by the court | 3 months |
| 7/3/97 | Trial date reset by court | 7 months |
| 11/12/97 | Court grants Bradley's motion to substitute counsel | 1 month |
| 3/4/98 | Court permits Bradley's counsel to withdraw and appoints counsel | 7 months |
| 10/14/98 | Court gives Andrian time to get malpractice coverage from the county | 4 months |

**[2]** In summary, 21 months of delay resulted from actions of the court, one month from Bradley's request to change counsel. To excuse the denial of counsel of choice because of delays largely produced by the court itself is objectively unreasonable.

**[3]** 2. *Inability to afford counsel.* In the initial substitution of appointed counsel for retained counsel, petitioner was given no chance to contest the conclusion, apparently reached by the judge even prior to the in-camera proceeding, that she could not pay. Due process does not permit a judge to decide such a question without hearing the affected party. *Audi alteram partem* — hear the other side — is what makes the legal process work in an adversary system.

**[4]** "[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them."

*Gonzalez-Lopez*, 126 S. Ct. at 2565. But a court could not assume that because petitioner was under twenty-one and her father had been difficult that she had no way of paying for counsel. Decide first, defend later is not an axiom of constitutional law. To deny assistance of counsel on account of the impecuniousness of the defendant required a hearing to explore the case.

**[5]** The disregard of petitioner's right was the more egregious in that Dunlevy informed the judge that Bradley "would be objecting to my being relieved" and that Bradley had retained Hutchinson to represent her on that issue. The judge did not hear Bradley or her representative. The judge capped his conduct by concealing from her the record of the closed in-camera proceeding from which she had been excluded. To assert, as the California Court of Appeal asserted, that petitioner did not lack counsel because Dunlevy, the lawyer seeking to get out, and Andrian, the lawyer seeking to get in, were looking out for her interests, is objectively unreasonable. Neither was in a position to represent her. A lawyer is not someone "concerned" with the interest of a defendant. A lawyer is the person speaking for and in the name of the client.

**[6]** Andrian was appointed and continued in the case as the direct consequence of this unconstitutional proceeding.

**[7]** *Harmful error.* We look at the Court of Appeal's application of the test of harmless error to what that court properly conceded might be constitutional error. Applying *Brecht v. Abrahamson*, 507 U.S. 619 (1993), we consider whether the deprivation of the assistance of counsel was harmful to petitioner. The state relies on *Morris v. Slappy*, 461 U.S. 1, 13 (1989) (the right to a "meaningful attorney-client relationship" is "without basis in the law"). No doubt it is difficult to determine when such a relationship exists, so it is hard to use as a standard for measuring whether the right to assistance of counsel has been denied. It can be determined, however, that a relationship in which client sues lawyer and lawyer does not

speak to client has broken down. Such was the situation here in December 1998, a month before trial was scheduled. The lawyer spoke to his client when the county insured him against liability, creating a singular dependance of defense counsel on an agency associated with the prosecution. This restored communication led to Andrian's proposal of an insanity defense unacceptable to his client. On such key questions as to whether he should pursue a plea bargain or whether she should take the stand at trial, she had a lawyer that she was still rejecting in January 1999 and seeking to replace with retained counsel. By any measure, an adversary relationship had replaced a lawyer-client relationship. It was objectively unreasonable to find no harm in Andrian's continuation and in the denial of Jordan's offered assistance.

*Summary.* The in-camera hearing without petitioner present denied her right to the assistance of counsel, an error confirmed and compounded by the court's refusal to let petitioner address the issue in open court. The harmful sequel to this first error of constitutional magnitude was the court's constitutional error in refusing to replace Andrian when the attorney-client relationship between him and petitioner had broken down. This error led to the third denial of the right to assistance of counsel: the court's refusal to have Andrian be replaced or assisted by Jordan, with the resultant injury to the petitioner's defense at trial.

For the reasons stated, the judgment of the district court is REVERSED and the case is REMANDED for proceedings in accordance with this opinion.

---

CLIFTON, Circuit Judge, with whom Circuit Judges SCHROEDER, W. FLETCHER, and BERZON join, concurring in the judgment:

I concur in the judgment reversing the denial of Petitioner Nicole Bradley's petition for habeas corpus under 28 U.S.C.

§ 2254. I write separately because my conclusion is based specifically upon the denial by the trial court of Bradley's January 1999 motion, filed more than six weeks before the then-scheduled trial date, to substitute retained counsel Jonathan Jordan for the attorney previously appointed by the court to represent her, Chris Andrian. I conclude that the subsequent decision by the California Court of Appeal to affirm Bradley's conviction despite that denial of her motion to substitute was an unreasonable application of established Supreme Court precedent, even under the deferential standard applicable to our review of a state court conviction. Judge Noonan's opinion also rests on two other decisions by the trial court identified as unreasonable denials of the right to counsel, specifically in March 1998 when prior retained counsel withdrew and was replaced by appointed counsel Andrian, and in October 1998 when the trial court denied Bradley's motion to replace Andrian. Although those events color the circumstances faced in January 1999 when the motion to substitute Jordan for Andrian was denied, I do not find it necessary to conclude that the earlier decisions by the trial court were improper.

## I

At the time Bradley filed her motion for substitution, the Supreme Court had unambiguously established that the Sixth Amendment right to counsel included the right to retain the counsel of one's choice. *Caplin & Drysdale, Chatered v. United States*, 491 U.S. 617, 624 (1989) (noting that, although an indigent defendant is not entitled to have the attorney of his choice appointed, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds."); *see United States v. Gonzalez-Lopez*, 126 S.Ct. 2557, 2561 (2006) ("We have previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him.") (citing

*Wheat v. United States*, 486 U.S. 153, 159 (1988); *cf. Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.")).

The right to select counsel is not unlimited, to be sure. The Supreme Court has established certain limitations on "the right to select and be represented by one's preferred attorney." *Wheat*, 486 U.S. at 159. It held that a defendant could not insist on representation from a particular attorney unless (1) the defendant could afford the attorney's fees or the attorney agreed to represent the defendant without pay, (2) the attorney was a member of the bar, (3) the attorney was willing to represent the defendant, and (4) the attorney did not have a relationship with an opposing party. *Id.* In addition, the Court established that where the government makes "a showing of a serious potential" for a conflict of interest, the trial court has wide latitude in determining whether the defendant may waive the conflict under the circumstances and facts of the individual case. *Id.* at 162 164. Furthermore, though it was not discussed by the Court in *Wheat* or in any other decision prior to the events in this case, I agree that the trial court is entitled to manage its docket and may deny a motion to substitute retained counsel if there is a substantial risk that the substitution will result in an undue delay of the proceedings.

## II

On January 7, 1999, forty-six days before her scheduled trial date, Bradley moved to substitute a retained attorney, Jordan, for the lawyer the court had previously appointed for her, Andrian. Her motion included a declaration from Jordan, her counsel of choice, in which he stated that Bradley's family had first contacted him regarding representing Bradley in March 1998, ten months before, but that he had been unable to take the case due to his other commitments at the time. He declared that he had since discussed the case with an investi-

gator on the case and with Bradley's family, and he had been able over the "ensuing months" to familiarize himself with its key issues. Jordan concluded: "My grasp of the case is of a sufficient nature such that with the time remaining before trial, I see no reason not to be ready at the time of trial."

The trial court conducted a hearing on Bradley's substitution motion shortly after its filing. The court's chief concern appeared to be over the delay that a substitution might cause in light of the case's history. Jordan explained that his substitution was not part of a delaying tactic or a procedural hindrance that would disrupt "the ordinary process of the proceedings." Rather, he stated that "[a]s the Court is aware from my declarations, that process is not in danger from my standpoint today. I have told the Court that I am going to be ready for trial on the 22nd of February. I don't see that changing at this point." After discussing the relevant cases, in which substitutions were jeopardized because of the delays they would cause, Jordan reiterated, "I am here to represent that that delay that this Court may be concerned with is not present in this case."

During the hearing, the trial court also expressed apprehension over Bradley's potential inability to pay her counsel, which might result in a future additional substitution. The court asked Bradley, "do you personally have the funds to pay for counsel to represent you now and through trial . . . ?" She responded, "I don't know." Jordan then interjected, "if I may interrupt for a second, does the Court want to go into the financial arrangements to satisfy itself that, based upon its prior experience, counsel that is formerly —". Before he could finish, the trial court itself interrupted, stating, "I don't really want to do that." It did, however, permit Jordan to briefly address what the court stated was its "feeling that if counsel isn't paid and hired by the defendant, counsel is and historically has been in this case susceptible to the ongoing method of substitution . . . ." Jordan replied, "Taking into account my comment that there was no intention to delay in

this case, I encompassed in that statement the concern about the financial relationship between myself and either Ms. Bradley or her family, and I can assure the Court that that is not a concern at this point." He added, "it would be disingenuous for me to come in a month and a half before trial just to leave in three weeks. . . . I don't think that would work with the Court."

Following this discussion, the trial court concluded that "the ongoing method of substitution has delayed this case for so long . . . there is a significant and I do believe determinative danger of delay in substituting counsel at this point, so the motion for substitution of counsel is denied." The California Court of Appeal subsequently affirmed the decision, citing the reasons the trial court discussed as well as noting that Jordan's assurances that he was prepared to begin the trial on time were equivocal and that Bradley might delay the trial by suing Jordan in order to manufacture a conflict.

It is undisputed that three of the five reasons the Supreme Court articulated in *Wheat* for denying a criminal defendant the right to the counsel of her choice were not applicable: Jordan was a member of the California bar, was willing to represent Bradley, and had no relationship with the government or other identified ethical conflict. The critical question is therefore whether the denial of Bradley's motion was justified because (1) she could not afford her attorney's fees and her attorney had not agreed to represent her without pay, (2) there was a serious potential for an unwaivable conflict of interest, or (3) the substitution would delay the start of Bradley's trial.

## A.   Attorney's Fees

The principal focus of the limited consideration given by the trial court at the hearing on the motion to substitute was on the financial arrangement with Jordan. Given that Bradley did not have substantial assets of her own and had depended upon her father for financial support, and that Bradley's prior

retained counsel withdrew for alleged non-payment, the trial court had reason for concern. It was not inappropriate for the trial court to inquire into the possibility that Jordan might himself subsequently move to withdraw for financial reasons, forcing further delay in the trial.

The court's concern does not justify the court's failure to inquire seriously into the subject, however. A review of the record makes it clear that the trial court failed to conduct an inquiry sufficient to justify its denial of Bradley's Sixth Amendment right to retain the counsel of her choice. Notably, the court never asked whether Jordan was prepared to represent Bradley without being paid more than he had already been paid. It did not ask whether there was a secure source of funding for any future payments that would be required. Nor did the court appear to consider the fact that the court had the power to deny any future motion to withdraw which Jordan might seek to file. The trial court could have told Jordan that he would be bound by his commitment to see the case through and asked Jordan whether he was prepared to proceed on those terms. But that question was not asked, and a negative answer from Jordan cannot be assumed. Having failed to explore the subject seriously, let alone to make a record demonstrating a realistic possibility that financial concerns would lead Jordan to move to withdraw in the future, it was unreasonable for the court simply to deny Bradley her right to retained counsel of her choice instead.

The paucity of serious inquiry makes apparent that the trial court had already concluded that it was not going to permit the substitution. Moreover, in the absence of such an inquiry, Jordan's assertion that there were no financial concerns that would interfere with his representation of Bradley was undisputed. The record before the court provided insufficient basis for a finding that Bradley could not afford her chosen counsel and for the resulting denial of Bradley's right to retained counsel of her choice.

## B.   Conflict of Interest

The California Court of Appeal concluded that, even if Jordan "had the best of intentions" and "was adequately compensated," Bradley "could attempt to manipulate the system by filing a lawsuit against Jordan, creating a conflict that would preclude his continued representation of her." As discussed above, the existence of a conflict of interest may limit a defendant's right to retain a particular attorney. That potential exists in every single case, however. That theoretical possibility does not mean that the right to retained counsel of choice can simply be waved away.

The Supreme Court has held that to deny a criminal defendant the right to the counsel of her choice, the government must make "a showing of a serious potential for conflict." *Wheat*, 486 U.S. at 164. In addition, the Court has held that "[t]he evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court," which must "be allowed substantial latitude in refusing waivers of conflicts of interest." *Id.* at 163-64.

Not only is there nothing in the record to demonstrate that the government made any showing whatsoever before the trial court on the issue of a conflict of interest, the trial court did not even discuss the potential for such a conflict to arise. Nor did the court determine that, if a conflict were to arise here, it would be unwaivable. Though it is true that Bradley had her differences with appointed counsel Andrian, who had been appointed to represent her over her objections, there is nothing that supports speculation that she would have any such differences with Jordan, the attorney she affirmatively sought. As the issue was neither raised before nor addressed by the trial court, the California Court of Appeal's conclusion that the potential for a conflict of interest supported the trial court's denial of Bradley's motion for substitution was contrary to clearly established Supreme Court precedent.

## C. Potential for Delay

Both the trial court and the Court of Appeal held that the potential delay that Jordan's substitution might engender was sufficient to warrant abridging Bradley's Sixth Amendment rights. Although there are undeniably circumstances under which the demands of a court's calendar and the need to bring a case to trial may constitute compelling justifications for denying a criminal defendant her right to retain the counsel of her choice, such that recognition of this additional limitation on the Sixth Amendment does not constitute an unreasonable extension of applicable Supreme Court precedent, those circumstances were not present here.

In this case there was, at most, a potential risk that granting Bradley's motion might lead to future circumstances under which her new attorney might request a continuance. There was no evidence whatsoever that his representation would inevitably cause any actual delay of Bradley's trial, or even that there was any substantial risk of delay.

The trial court cited Bradley's prior substitutions as causing "interminable delays." As Judge Noonan's opinion demonstrates, however, only a limited portion of the delay was attributable to Bradley. More importantly, the proposed new attorney, Jordan, was aware of the scheduled trial date and sought no additional time to prepare. To the contrary, Jordan submitted a sworn declaration in which he attested that he would be ready to begin on the trial date then scheduled. Jordan was also clear during the hearing that he was not requesting a continuance.

To justify its decision the California Court of Appeal seized on potentially equivocal language in Jordan's statements. It noted that he attested only that he saw "no reason not to be ready at the time of trial" and that he did not "see that changing at this point." That Jordan failed to use the firmest and most direct possible terms to express himself does not support

the Court of Appeal's speculation that he would later seek a continuance. Lawyers are trained to be cautious. It is not a surprise that Jordan might not want to waive all contingencies unless pressed to do so. For all he knew, he might have a heart attack or be run over by a bus before the trial date. But no fair reading of Jordan's declaration or his statements at the hearing could support a conclusion that he was laying the groundwork for a future request to continue the trial, or that he had any reason to expect that the trial court would be receptive to such a request.

Even assuming that Jordan might have later moved for such a continuance, the trial court had the power to deny the motion. A denial of such a motion would likely have been sustained under these circumstances, especially if Jordan had been put on notice of the court's intent to avoid further delay. As the Supreme Court held in *Morris v. Slappy*, 461 U.S. 1, 11 (1983), trial courts "necessarily require a great deal of latitude in scheduling trials" and are therefore accorded broad discretion on matters of continuances. In sharp contrast to the limited exceptions to the right to counsel of one's choice, "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id.* at 11-12 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). If Jordan had responded to the court in an equivocal fashion after that, perhaps the denial of Bradley's constitutional right to retain the counsel of her choice would have rested on a stronger foundation. But it was unreasonable for the court simply to deny the substitution motion — and thus to deny Bradley's exercise of her right to retained counsel of choice — out of fear that something might happen to delay the trial.

The California Court of Appeal reasoned that Jordan's assurances that he would be prepared were unpersuasive because he had yet to review the twelve boxes of materials Bradley's appointed counsel had accumulated. Jordan had already spent hours meeting with Bradley's appointed coun-

sel, however, and he had discussed the case with Bradley's family and the investigator. Bradley also filed her motion for substitution forty-six days, or six and a half weeks, before her trial date. Jordan told the trial court that this was a sufficient amount of time to properly prepare, and the trial court did not question or dispute this representation. Not surprisingly, the Warden has not pointed to a single case in any court where a motion to substitute counsel was denied so far in advance of trial because of the potential for delay.

Trial courts have a number of tools at their disposal to ensure a fair trial and the integrity of the process without offending the Sixth Amendment. As we previously held in *United States v. Lillie*, a court may "inquire into the new counsel's preparedness, and to condition the granting of the motion on defendant's (and new counsel's) willingness to continue with the existing schedule." *United States v. Lillie*, 989 F.2d 1054, 1056 (9th Cir. 1993) (applying *Wheat*, 486 U.S. at 159, and holding that a district court committed reversible error when it denied a motion for substitution filed the morning of trial), *overruled in part on other grounds in United States v. Garrett*, 179 F.3d 1143, 1145 (9th Cir. 1999). It may also "be justified in obtaining the defendant's waiver of any ineffective assistance of counsel claim growing from the late substitution." *Id.* (citing *United States v. McClendon*, 782 F.2d 785, 786 (9th Cir.1986)). In this case, rather than exercise these options, the trial court simply denied Bradley's motion for substitution. It did so despite Jordan's undisputed representation, well in advance of trial, that he was prepared to proceed without delay. As the trial court and California Court of Appeal lacked any valid justification for depriving Bradley of her Sixth Amendment right to the counsel of her choice, their adjudication of her motion was contrary to clearly established Supreme Court precedent.

**III**

The Supreme Court recently held that "erroneous deprivation of the right to counsel of choice, with consequences that

are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.' " *Gonzalez-Lopez*, 126 S.Ct. at 2564 (internal quotation omitted). It reasoned that "[h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." *Id.* at 2565.

The Warden contends that *Gonzalez-Lopez* is inapplicable because it was not decided until after the relevant state court decisions in this case. That fact is of no consequence, however, as *Gonzalez-Lopez* is not being applied to evaluate whether the state decisions were erroneous. *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 390 (2000). The California Court of Appeal found no constitutional violation and therefore never reached the issue of whether the violation was subject to review for harmlessness. Accordingly, *Gonzalez-Lopez* has no bearing on whether its decision was erroneous. Rather, *Gonzalez-Lopez* guides us in determining the consequences of the erroneous state decision. In this case, it requires reversal of Bradley's conviction.

I join the judgment that the district court's denial of Bradley's petition for writ of habeas corpus must be reversed.

---

SILVERMAN, Circuit Judge, with whom TALLMAN, Circuit Judge, joins, dissenting:

The majority holds that Bradley's wrongful exclusion from a critical hearing justifies reversal despite an explicit determination by the California Court of Appeal that the exclusion was harmless. Furthermore, it criticizes the trial court's denial of Bradley's request to replace appointed counsel with retained counsel one month before trial, but ignores the trial court's reasoning which is amply supported by the facts — Bradley's poor track record of maintaining relationships with previous retained counsel.

My colleagues' de novo analysis flies in the face of those facts and the reasoning offered by the California courts, the law of our circuit, and the constraints of AEDPA. I respectfully dissent.

## I.  Facts

Bradley is alleged to have shot and killed the driver of a car during an attempted carjacking on January 17, 1996. She was charged with attempted robbery, carjacking, possession of a short-barreled shotgun, and murder in the first degree.

Bradley was first represented by Patrick Hutchinson and Jack Montgomery. On March 15, 1996, the trial court disqualified Montgomery due to a conflict of interest. Marteen Miller replaced Montgomery on June 10.

On October 18, 1996, Melvin Sacks replaced Hutchinson and Miller, and was thereafter joined by Jamie Thistlewaite. The original trial date of April 14, 1997 was continued twice, first to July 18, 1997 and then to March 2, 1998. At some point during this period, Bradley's father stopped paying for Sacks's services. Sacks then ceased all work on the case, causing an "irreconcilable breakdown" between him and Bradley.

On November 12, 1997, Bradley filed a motion to substitute Kerry Steigerwalt as her attorney and to continue the trial to April 1998. A second attorney, Cynthia Dunlevy, joined later. Both Steigerwalt and Dunlevy were retained by Mr. Bradley for his daughter. The trial court granted the motion with the following admonition:

> I want to make it very clear to the defendant and her father this will be the last change in counsel. We've had quite a few competent lawyers coming through the defense of the matter. This has to be the end of the changes in that regard.

On March 4, 1998, Steigerwalt and Dunlevy requested that they be discharged from representation. They alleged the following: (1) Mr. Bradley had not paid them nor their experts in accordance with the retainer agreement, causing financial hardship, (2) Mr. Bradley insisted that they obtain continuances, became distressed when continuances were not sought, and strategized a plan to secure more time, and (3) Mr. Bradley's actions interfered with the attorney-client relationship.

The trial court conducted an in-chambers hearing with the Sonoma County district attorney, the trial prosecutor, a county investigator, Dunlevy, and two new defense lawyers — Chris Andrian and Steve Gallenson. Bradley was not present. At this point, Dunlevy expressed concern that Mr. Bradley had hired independent private investigators to surveil and collect personal information about the prosecutor, which raised understandable security concerns for the prosecutor's safety. Furthermore, Dunlevy suggested that Mr. Bradley had a psychological hold on his daughter. He insisted on participating in conversations between his daughter and her lawyers. He also actively discouraged his daughter from a plea bargain despite her earlier "intense" desire to consider such an option. The trial court sealed the transcript of the hearing.

Soon thereafter in open court, with Bradley then present, the court granted Dunlevy's motion to withdraw and appointed Andrian to represent Bradley. The trial judge said:

> [T]his case is two years old. It's way beyond the time that it should have been on the table for trial or settlement. I am concerned that this case would never get to trial with retained counsel. The only way to get the case to trial is through appointed counsel. I am convinced of that looking at the history of the case, the multiple attorneys who have gone through the case on a retained basis, the failure to properly pay for the investigation that was anticipated by the various lawyers working on the case.

A new trial date was set for October 26, 1998.

On October 14, 1998, Bradley sought yet another continuance. Five days later, she filed an ex parte motion under *People v. Marsden*, 465 P.2d 44 (Cal. 1970), expressing dissatisfaction with Andrian's representation. Bradley alleged that Andrian inadequately communicated with her, ignored her ideas on how to prepare a defense, pursued an insanity defense without her authorization, and did not return phone calls from her father. The trial court found that the record did not establish inadequate representation and denied the motion.

At this time, Andrian noted a possible conflict of interest because Bradley had filed a complaint against him with the state bar and may have filed a civil lawsuit against Andrian's firm. The trial court granted a continuance to resolve the matter. After the County agreed to indemnify Andrian, trial was reset for February 22, 1999.

On January 7, 1999, Bradley made another motion to replace counsel, this time to replace Andrian with a retained attorney, Jonathan Jordan. Bradley argued that her relationship with Andrian "ha[d] broken down to the point that any possible presentation of an adequate defense has been substantially interfered with." Jordan asserted that he would be ready for trial and that he had no problems with the Bradley family.

At a hearing on the motion, Bradley responded "I don't know" when the trial court inquired about any changes in her financial circumstances that would have allowed her to hire Jordan. Jordan offered to describe his financial arrangements. The trial court declined the offer, but invited him to make a record. The court then denied the motion, citing a "determinative danger of delay in substituting counsel."

Jordan alternatively requested that he be allowed to associate with Andrian as co-counsel. The court denied the

motion, citing concerns about liability issues and possible delay.

Bradley was tried and convicted on all charges.

## II.  Discussion

### A.  Right to be Present at March 4, 1998 Conference

I agree that Bradley's due process rights were violated by her exclusion from the March 4, 1998 in-chambers conference. Any hearing that threatens a defendant's Sixth Amendment right to representation by retained counsel must be *a fortiori* a "critical stage" of the criminal proceeding, requiring the defendant's presence. *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). However, the error is subject to review for harmlessness. *See Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005) (en banc).

The California Court of Appeal made a harmlessness determination: "Given the age of the case and the trial court's own observations of a parade of retained attorneys passing through its court as counsel for Bradley, we cannot imagine anything that Bradley could have said that would have changed the court's ruling."

In support of this conclusion, the court found that Bradley had no personal knowledge of her father's financial arrangements with Dunlevy, nor any direct knowledge about her father's alleged interference with the case. Absent clear and convincing evidence to the contrary, we must presume the correctness of these findings. *See* 28 U.S.C. § 2254(e)(1).

In her opening brief, Bradley now argues that, had she been present and allowed to speak at the conference, she would have presented contrary evidence that Dunlevy had been adequately paid, that her father had not hired an investigator to harass the prosecutor, and that her father had not interfered

with the attorney-client relationship. This is nothing more than the argument of counsel — speculation unsupported by testimony, affidavit or declaration.[1] Lacking any such evidence, Bradley cannot now meet her burden of rebutting the factual findings underlying the Court of Appeal's harmlessness determination.

### B. Right to Substitute Jordan on January 7, 1999

Under the Sixth Amendment, a defendant who does not require appointed counsel has the right to choose who will represent him. *See Wheat v. United States*, 486 U.S. 153, 159 (1988); *see also United States v. Gonzales-Lopez*, 126 S.Ct. 2557, 2561 (2006). However, this right is not absolute. A trial court has wide latitude in balancing the right against the need to avoid conflicts of interest, the need to manage its calendar, and the need to ensure that the trial is conducted within ethical standards. *Gonzales-Lopez*, 126 S.Ct. at 2565-66; *see also United States v. Kelm*, 827 F.2d 1319, 1322 (9th Cir. 1987) ("[A] court must be wary against the 'right of counsel' being used as a ploy to gain time or effect delay.").

Jordan was not hired by Bradley or being paid by her, but by her father. Such a dynamic had caused numerous delays in the past. Jordan attempted to assuage the court's concerns, but as the California Court of Appeal found, "those assurances were not as definitive as Bradley portrays them." For example, Jordan said that "[he saw] no reason" not to be ready for trial and "[didn't] see that changing *at this point*" (emphasis added). He similarly qualified his assurances about his financial relationship with the client, noting that it "[was] not a concern *at this point*" (emphasis added). The California Court of Appeal also noted Jordan's limited preparation in the case

---

[1] It is also significant to note that Bradley did not seek an evidentiary hearing in the California courts to substantiate these factual allegations. *See* 28 U.S.C. § 2254(e)(2); *see also Williams v. Taylor*, 529 U.S. 420, 436-37 (2000).

at the time of the motion. Although he had met with Bradley's family, a former investigator on the case, and Bradley herself, he had not had reviewed any of the twelve boxes of case materials, yet the trial was only a month away.

Faced with these concerns, the trial court denied the motion, finding that "in spite of the comments and [intentions] and current offers of counsel, there is significant and I do believe determinative danger of delay in substituting counsel at this point." The California Court of Appeal held: "Given the magnitude of the accumulated materials, the paucity of Jordan's preparations and the fact that the special circumstances allegation had not yet been dismissed, Jordan's equivocal assurances of readiness were clearly inadequate."

In light of the nearly three-year pretrial history of unrelenting problems with counsel and the continuances they caused, the state court's ruling was not contrary to or an unreasonable application of *Wheat*. *See* 28 U.S.C. § 2254(d)(1). As the California Court of Appeal found, given the complexity and severity of the criminal charges, the trial court's skepticism of Jordan's assurances that he would be ready for trial in a month was not without basis. The same goes for the trial court's refusal to allow Jordan to associate as co-counsel with Andrian. The California Court of Appeal was not unreasonable in holding that Jordan's proposed role as co-counsel was a recipe for conflict with existing counsel that could be expected to result in still more delay.

The trial court had a duty to protect Bradley's right to counsel, but it also had a duty to bring this case to trial. In the face of challenging circumstances, the state court reasonably discharged both of these duties. The decision to do so was adequately supported by the record before us and the determination by the California Court of Appeal that any error in excluding Bradley from the chambers conference was harmless is not objectively unreasonable under AEDPA. I would affirm the district court.